**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| VIRGINIA CARAZANI, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-107 (RC) |
| | : | | |
| v. | : | Re Document No.: | 15 |
| | : | | |
| EMMA ZEGARRA, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**Granting the Plaintiff's Motion for Default Judgment**

## I. INTRODUCTION

The plaintiff, Virginia Carazani, a citizen of Bolivia, entered into a contract with the defendant, Emma Zegarra, to work as a housekeeper in the United States. The plaintiff alleges that once she moved to the United States, the defendant reneged on the contract and instead had the defendant work in her home for almost three years without pay. She now seeks damages pursuant to the Fair Labor Standards Act ("FLSA"), and the Trafficking Victims Protection Act of 2000 ("TVPA"). 29 U.S.C. § 216(b) (2008); 18 U.S.C. § 1595(a) (2008).

Despite the defendant's initial cooperation in this case, she has ignored a court-ordered Motion to Compel, failed to attend a court-ordered status hearing, and has been unresponsive to discovery requests since the filing of the April 27, 2012 Status Report. In response, the plaintiff has moved for the Court to enter default judgment against the defendant under Rule 37 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 37.

Because the defendant has repeatedly failed to comply with court orders or cooperate in discovery, the Court grants Carazani's motion for sanctions, and enters default judgment against Zegarra. The Court awards damages accordingly.

## II.  FACTUAL & PROCEDURAL BACKGROUND

For eight years prior to 2006, the plaintiff worked as the defendant's housekeeper in Bolivia. Am. Compl. ¶ 14. In 2006, when the defendant accepted a job at the World Bank in the United States, the plaintiff agreed to accompany her to work as her housekeeper in the United States. Am. Compl. ¶ 16. Before the parties moved, they signed an employment contract that stipulated to the following in English and Spanish: (1) the plaintiff would work forty hours, five days per week as a housekeeper from December 25, 2006 to December 25, 2008; (2) the defendant would pay the plaintiff either $7.08 per hour or the greater of the minimum wage and the applicable prevailing wage under U.S. Department of State ("DOS") guidelines; (3) the defendant would pay the plaintiff overtime as required by state law; (4) the plaintiff would receive four holidays, five paid sick days, fifteen paid vacation days; (5) the defendant would make the plaintiff's tax payments; and (6) the defendant would provide the plaintiff and her dependents with meals, lodging, and medical insurance. *See generally* Pl.'s Supp'l Mot., [Dckt. #17, Ex. A], ("Contract").

The plaintiff worked between sixty-six and seventy-five hours, seven days per week over the course of three years. Am. Compl. ¶ 41, [Dckt. #13]; Pl.'s Supp'l Wage Calculation, [Dckt. #18]. In exchange, the defendant paid her the $8.50 necessary to keep her bank account open, a requirement under World Bank rules. Am. Compl. ¶¶ 39, 41. The plaintiff received no time off during this period except for four days while she was in the hospital, the expenses for which she paid with money provided by her family. *Id.* at ¶¶ 25-26.

Once the parties arrived in the United States, the defendant took the plaintiff's passport and papers and her son's legal papers, claiming the confiscation was to keep the documents safe. *Id.* at ¶ 22. The defendant also informed the plaintiff that she would be paid half of the contractual salary in order to pay for housing, food, and medical insurance, Pl.'s Supp'l Mot., [Dckt. #17, Ex. A], ("Carazani Decl.") ¶ 43, each of which was guaranteed at no cost to the plaintiff in the Contract. Contract §§ 8, 9. For the first year, the plaintiff worked 75 hour weeks from 6:30 AM until 9:00 PM with two short breaks each day. *See* Carazani Decl. ¶ 39. The plaintiff and her son lived in the basement, and occasionally the laundry room, of the defendant's house. *See* Carazani Decl. ¶ 41. Initially, the defendant told the plaintiff she would receive her reduced salary in a savings account. *Id.* at ¶ 44. Several months after arriving in the United States, the defendant told the plaintiff that she did not have enough money to pay the salary. *Id.* at ¶ 45. Ultimately, the defendant only paid the plaintiff the $8.50 necessary to keep her bank account open. Am. Compl. ¶ 40-41.

During her time with the defendant, the plaintiff incurred $35,849.33 in medical expenses under the belief that they would paid for by the medical insurance stipulated to in the contract. *See* Pl.'s Supp'l Mot., [Dckt. #17, Ex. F], ("Medical Expenses"); Am. Compl. ¶ 26; Contract § 9. Among the larger expenses was a hospital visit by the plaintiff's son on April 24, 2007, the plaintiff's hospitalization for abdominal pain on February 25, 2008, and a second hospitalization of the plaintiff for an anxiety attack on October 22, 2008. *See* Carazani Decl. ¶¶ 50, 67, 75; Medical Expenses.

While the plaintiff, who only spoke Spanish, stayed with the defendant, the defendant forbade her to speak to anyone outside of the house. *Id.* at ¶ 27. The defendant emphasized that the plaintiff could not tell anyone that she was not being paid. Carazani Decl. ¶ 46. The

defendant also told the plaintiff that the she could listen to the plaintiff's phone conversations by using a surveillance device from work. Am. Compl. at ¶ 29.

In 2008, the defendant failed to renew the plaintiff's visa, having not paid the plaintiff's employment taxes. *Id.* at ¶ 44. This forced the plaintiff to become an undocumented immigrant, which she claims increased her dependence on the defendant. *Id.* Alongside threats of deportation by the defendant and her daughter, the plaintiff believed that she would be deported if she did not continue to work for the defendant. *Id.* at ¶ 30. The plaintiff was ultimately able to escape from the defendant's home in 2009 with the assistance of a Good Samaritan and a Federal Bureau of Investigation agent. *Id.* at ¶ 5. On January 23, 2012, she filed this action against the defendant under the FLSA and TVPA. *Id.* at ¶ 6, 8.

After the plaintiff agreed to a time extension, the defendant filed an Answer on February 28, 2012. Answer, [Dckt. #6]. On March 28, 2012, the parties participated in an Initial Scheduling Conference, during which this Court ordered the parties to exchange Initial Disclosures by April 20, 2012 and file a Status Report by April 27, 2012. Scheduling and Procedures Order, [Dckt. #9]. Under the Status Report, the defendant agreed to amend pleadings or join additional parties by May 31, 2012, "exchange initial document requests and interrogatories" by June 29, 2012, respond to these initial requests by July 26, 2012, exchange requests for admission by August 20, 2012, exchange disclosures under Federal Rule of Civil Procedure 26(a)(2)(B) and (C) by September 6, 2012, respond to requests for admission by September 20, 2012, complete all depositions and supplements to expert reports by September 20, 2012, and complete all discovery by September 28, 2012. Status Report, [Dckt. #12]; FED. R. CIV. P. 26(a)(2)(B), (C). The plaintiff served the defendant with the first set of document

requests and interrogatories on June 29, 2012 through U.S. mail and email. Pl.'s Mot. to Compel, [Dckt. #14, Ex. D], ("Apfel Decl.") ¶ 6.

After failing to receive the defendant's Initial Disclosure or response to discovery requests by their respective deadlines, the plaintiff's counsel sent two emails to the defendant inquiring about the status of her Initial Disclosure on May 7, 2012 and May 15, 2012 and two emails about the status of the discovery requests on August 3, 2012 and August 7, 2012. *See* Pl.'s Mot. to Compel, [Exs. B, E]. On August 9, 2012, the plaintiff's counsel called the defendant's work number. Apfel Decl. ¶ 8. The individual who answered the phone told the counsel that the defendant "no longer worked at the World Bank" and "was currently out of the country." *Id.* The plaintiff's counsel then called one of the defendant's friends at the World Bank, who told her that the defendant "had left the country and had no intention of returning." *Id.* at ¶ 9. The World Bank Human Resources Department told the plaintiff's counsel that the defendant "used to work there." *Id.* at ¶ 10. Finally, the plaintiff's counsel called the defendant's home number on the same day and "received a recording that said that the number was no longer in service." *Id.* at ¶ 11.

On August 21, 2012, the plaintiff filed a Motion to Compel and for an Immediate Status Conference. Pl.'s Mot. to Compel. On August 27, 2012, the Court granted the plaintiff's Motion in part and ordered a status conference to be held on September 14, 2012. The defendant ignored the Order by failing to appear at the September 14, 2012 status conference. The Court then granted the Motion in its entirety on September 14, 2012 and ordered the defendant to produce Initial Disclosures and Responses to Discovery Requests within one week of the Order. Pl's Mot. to Compel. The defendant disregarded this Order by failing to produce either Initial Disclosures or Responses to Discovery Requests within one week. On November 26, 2012, the Court ordered

the parties to submit a Joint Status Report by December 14, 2012. The defendant disregarded this order by failing to file a Status Report. Instead, on December 12, 2012 the plaintiff alone filed a Status Report, indicating her belief that the defendant had fled to Bolivia. Pl.'s Status Report, [Dckt. #16].

## III.  ANALYSIS

### A.  Legal Standard for Default Judgment

Rule 1 of the Federal Rules of Civil Procedure declares that the Rules "should be construed and administered to secure the just, *speedy*, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1 (emphasis added). In keeping with this admonishment, default judgment serves as a tool "to achieve the orderly and expeditious disposition of cases." *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). Though there is a "strong presumption in favor of adjudications on the merits," courts may enter default judgment when the defendant is an "essentially unresponsive party" whose default is "plainly willful, reflected by its failure to respond to the summons and complaint, the entry of default, or the motion for default judgment." *Id.*; *see also Chafin v. Chafin*, 133 S. Ct. 1017, 1025 (2013); *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Just as a district court has the authority to dismiss a case in order to protect its docket against a plaintiff's "dilatory tactics," so does it have the authority to enter default judgment against a defendant who similarly errs. *See Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980); *see also Int'l Painters and Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002).

Under Rule 37, obtaining default judgment is a two-step process. First, the court must determine whether sanctions are appropriate at all, based on whether a party failed to obey an order to provide or permit discovery under Rule 26(f), 35, or 37(a), whether a party failed to provide information or identify a witness under Rule 26(a) or (e), or whether a party failed to attend its own deposition, serve answers to interrogatories, or respond to a request for inspection. *See* FED. R. CIV. P. 37(b)(2)(A); FED. R. CIV. P. 37(c)(1); FED. R. CIV. P. 37(d)(1)(A)(i), (ii); *see also Perez v. Berhanu*, 583 F. Supp. 2d 87, 90 (D.D.C. 2008). Second, the court must determine which type of sanction is appropriate. *See* FED. R. CIV. P. 37(b)(2)(A)(i)-(vii); FED. R. CIV. P. 37(c)(1)(C); FED. R. CIV. P. 37(d)(1)(3); *see also Perez*, 583 F. Supp. 2d at 90. Among the sanctions available under Rule 37, default judgment is the "'sanction of last resort,' to be used only when less onerous methods (for example, adverse evidentiary determinations or other 'issue-related sanctions') will be ineffective or obviously futile." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (quoting *Shea v. Donohoe Construction Co.*, 795 F.2d 1071, 1075 (D.C. Cir. 1986)). Nevertheless, a court need not exhaust other sanctions, and may enter default judgment after establishing on the record that "the gravity of an inherent power sanction corresponds to the misconduct." *Shepherd*, 62 F.3d at 1479.

Three basic justifications support the use of default judgment among the Rule 37 sanctions. *Webb*, 146 F.3d at 971 (D.C. Cir. 1998); *Shea*, 795 F.2d at 1074-77 (D.C. Cir. 1986). First, default judgment is justified where the errant party's behavior "has severely hampered the other party's ability to present his case." *Webb*, 146 F.3d at 971 (citing *Shea*, 795 F.2d at 1074 (D.C. Cir. 1986)). Second, it is justified where the errant party's behavior places "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay" *Id.* (quoting *Shea*, 795 F.2d at 1075 (D.C. Cir. 1986)). Third, it is

justifiable where the errant party's behavior is "disrespectful to the court" and presents the need

"to deter similar misconduct in the future." *Id.* (quoting *Shea*, 795 F.2d at 1077 (D.C. Cir.

1986)).

Although default judgment establishes the defaulting party's liability for every well-

pleaded allegation in the complaint, it does not automatically establish liability in the amount

claimed by the plaintiff. *Shepherd v. Am. Broad. Cos.*, 862 F. Supp. 486, 491 (D.D.C. 1994),

*vacated on other grounds*, 62 F.3d 1469 (D.C. Cir. 1995); *PT (Persero) Merpati Nusantara*

*Airlines v. Thirdstone Aircraft Leasing Grp., Inc.*, 246 F.R.D. 17, 18 (D.D.C. 2007). Rather,

"unless the amount of damages is certain, the court makes an independent determination as to the

sum to be awarded." *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001); *see also*

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir.

1997). A court can make this determination through a hearing but need not "if it ensures that

there is a basis for the damages specified in the default judgment." *Embassy of the Fed. Republic*

*of Nigeria v. Ugwuonye*, No. 10-cv-1929 (BJR), 2013 WL 2247465, at *3 (D.D.C. May 22,

2013) (citing Fed. R. Civ. P. 55(b), (2)); *see also Transatlantic Marine Claims Agency, Inc.*, 109

F.3d at 111. One such basis is detailed affidavits or documentary evidence. *Flynn v. Mastro*

*Masonry Contractors*, 237 F. Supp. 2d 66, 69 (D.D.C. 2002); *Transatlantic Marine Claims*

*Agency, Inc.*, 109 F.3d at 111; *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir.

1979). If there is no hearing, courts can only award damages if the amount claimed is "a

liquidated sum or one capable of mathematical calculation." *United Artists Corp.*, 605 F.2d at

857; *see also Jackson*, 636 F.2d at 835; *Int'l Painters and Allied Trades Indus. Pension Fund*,

531 F. Supp. 2d at 57.

1.  The Court Will Grant the Plaintiff's Motion to Enter Default Judgment Against the
Defendant.

The plaintiff argues that the defendant's "pattern of non-compliance" with the Court's
discovery orders merits sanctions under Rule 37(b)(2). Pl.'s Mot. for Default Judgment at 4,
[Dckt. #15], (citing *Webb*, 146 F.3d at 971). The plaintiff analogizes the defendant's failure to
comply with the Court's March 28, 2012 Order to Produce, failure to attend the court-ordered
September 14, 2012 status conference, and failure to comply with the Court's August 21, 2012
Order to Compel to cases where courts have entered default judgment against defendants who
disregard similar orders and discovery requests. *Id.* (citing *Klayman v. Judicial Watch, Inc.*, 802
F. Supp. 2d 137, 152 (D.D.C. 2011); *Bristol Petrol. Corp. v. Harris*, 901 F.2d 165, 165 (D.C.
Cir. 1990); *Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 37 (D.D.C. 2004); *Secs. &
Exch. Comm'n v. Hollywood Trenz, Inc.*, 202 F.R.D. 3, 7 (D.D.C. 2001); *Walls v. Paulson*, No.
03 Civ. 0186 (RMU), 2008 WL 2520813, at *1 (D.D.C. June 23, 2008); *Tucker v. Dist. of
Columbia*, 115 F.R.D. 493, 496-97 (D.D.C. 1987). The defendant has not responded to the
plaintiff's Motion for Default Judgment.

In order to obtain default judgment under Rule 37, courts must first determine whether
sanctions are warranted. *See* FED. R. CIV. P. 37(b)(2)(A), (c)(1), (d)(1)(A); *see also Webb*, 146
F.3d at 971. Under Rule 37(b)(2)(A), a court may issue sanctions if a party "fails to obey an
order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a)." FED. R.
CIV. P. (b)(2)(A); *see also Azamar v. Stern*, 269 F.R.D. 53, 54-55 (D.D.C. 2010) (finding
sanctions appropriate under Rule 37(b)(2)(A) because the defendant "has repeatedly failed to
respond to plaintiff's written discovery requests" and "has not attempted to defend his failure in
any manner, despite repeated opportunities to do so"), *vacated in part*, 275 F.R.D. 1 (D.D.C.

2011) (vacating previous judgment after the defendant ultimately responded to discovery requests).

In this case, the defendant has repeatedly failed to obey court orders to provide or permit discovery, including the March 28, 2012 Scheduling and Procedures Order, the August 27, 2012 Order for Hearing, the September 14, 2012 Order to Compel, and the November 26, 2012 Order for a Joint Status Report. Accordingly, the Court finds that sanctions are appropriate under Rule 37(b)(2)(A) because the defendant has failed to obey several orders to provide or permit discovery.

The plaintiff then argues that among the sanctions available to the Court under Rule 37(b)(2)(A), the Court should enter default judgment against the defendant. Pl.'s Mot. for Default Judgment at 5. The plaintiff argues that default judgment is justified because the defendant's inaction has severely prejudiced the plaintiff's attempt to seek relief, has unreasonably delayed resolution of the case, and has demonstrated disrespect for the Court. *Id.* at 4 (citing *Webb*, 146 F.3d at 971). The defendant has not responded to the plaintiff's Motion for Default Judgment.

Though default judgment is a "sanction of last resort," district courts "need not exhaust other options before . . . imposing a default judgment" *Shea*, 795 F.2d at 1075; *Shepherd*, 62 F.3d at 1479. In *Webb*, the U.S. Court of Appeals for the District of Columbia Circuit set out three justifications that support the use of default judgment as a sanction for misconduct under Rule 37(b)(2): (1) if the errant party's behavior "has severely hampered the other party's ability to present his case;" (2) if the party's misconduct has placed "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay;" and (3) if there is a need "to sanction conduct that is disrespectful to the court and to

10

deter similar misconduct in the future." *Webb*, 146 F.3d at 971 (citing *Shea*, 795 F.2d at 1074-77); *see also Perez*, 583 F. Supp. 2d at 91 (finding default judgment appropriate under the first and third justifications where the defendants failed to respond to the plaintiff's written discovery requests and failed to appear at a deposition); *Ugwuonye*, 2013 WL 2172117, at *5 (finding default judgment appropriate under all three justifications where the defendant failed to respond adequately to interrogatories, failed to produce requested documents, and failed to meet four case deadlines).

Following the first *Webb* justification, the Court notes that the defendant's unresponsiveness has severely hampered the plaintiff's ability to present her case. The plaintiff has yet to receive the defendant's responses to the first set of document requests and interrogatories, which were served on June 29, 2012 and due on July 26, 2012. *See* Status Report, [Dckt. #12]. Nor has the plaintiff received the defendant's Initial Disclosure, which was due on September 6, 2012. *Id.* Moreover, the plaintiff's counsel has been unable to reach the defendant through telephone, U.S. mail, or email, despite repeated attempts and despite the parties' previous communication through the same channels. *See* Apfel Decl. ¶ 2-12. The defendant has been utterly unresponsive in this case since submitting the April 27, 2012 Status Report. Without responding to the plaintiff's discovery requests or basic attempts at communication, the defendant has severely hampered the plaintiff's ability to present her case.

Second, the defendant's defiance of Court Orders and discovery obligations has prolonged this case and has placed a significant burden on the Court. The defendant agreed to complete all discovery by September 28, 2012, and yet has made no effort to respond to any of the plaintiff's discovery requests. *See* Status Report. The defendant has not responded to the Court's August 27, 2012 Order for Hearing, the September 13, 2012 Order to Compel, or the

November 26, 2012 Order to submit a Joint Status Report. Nor has the defendant responded to the plaintiff's Motion for Default Judgment. The Court will no longer allow the case to be delayed to the defendant's benefit.

Third, the defendant's aforementioned defiance of three Court Orders and discovery obligations demonstrates disrespect for the Court and a need to deter similar misconduct in the future. None of the Orders encouraged the defendant to participate in the case, as evinced by her unresponsiveness throughout. Based on the plaintiff's counsel's conversations with two of the defendant's co-workers and the bounced service of the Motion for Default Judgment, it appears that the defendant has left the country. Therefore, further Orders would be unlikely to encourage participation in the case. Consequently, the Court enters default judgment against the defendant.

   2.  The Court Will Make an Independent Determination of Damages without a Hearing.

The plaintiff next argues that if the defendant is deemed to have admitted every well-pleaded allegation in the complaint, she is entitled to damages. *See* Pl.'s Supp'l Mot. (citing *Flynn*, 237 F. Supp. 2d at 69). In particular, the plaintiff claims lost wages for breach of contract, medical expenses for breach of contract, liquidated damages under the FLSA, emotional and punitive damages under the TVPA, punitive damages for fraud and fraudulent inducement under Virginia state law, and punitive damages for intentional infliction of emotional distress under Virginia state law. *Id.* The defendant has denied each of the plaintiff's allegations but has not responded to the Supplement to the Plaintiff's Motion for Default Judgment. *See generally* Answer.

Once default judgment has been entered, the defaulting party is deemed to have admitted every well-pleaded allegation in the complaint. *See Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds sub nom. Hughes Tool Co. v. Trans World*

*Airlines, Inc.*, 409 U.S. 363 (1973). The court then makes an independent determination of the damages. *Shepherd*, 862 F. Supp. at 491. Under Rule 55(b)(2), a court entering default judgment may conduct hearings or make referrals if it needs to determine the amount of damages. *See* FED. R. CIV. P. 55(b)(2)(B); *see also Shepherd*, 862 F. Supp. at 491. However, a hearing is not necessary if the court can resolve the damages claims "on the papers alone." *Shepherd*, 862 F. Supp. at 491; *see also Transatlantic Marine Claims Agency, Inc.*, 109 F.3d at 111.

In this case, the plaintiff has provided her employment contract, the prevailing wage determination policy guidance from the Employment and Training Administration, the prevailing wage rates for housekeepers from 2006 to 2009 in the Washington, D.C. area at Levels One and Two, the FLSA minimum wage for that period, a weekly tabulation of the hours the plaintiff worked, the plaintiff's medical expenses, the plaintiff's T-Visa, and Declarations from the plaintiff and her mental health counselor. *See generally* Pl.'s Supp'l Mot. for Default Judgment. The Court can determine damages from these papers alone, and therefore does not require a hearing.

### B. Legal Standard for Breach of Contract

Under the TVPA, victims "may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) . . . and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Violators must pay "the full amount of the victim's losses," which includes "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage." 18 U.S.C. § 1593(b)(3). Where the salary provision of a contract is unenforceable, the TVPA adopts the FLSA methodology to calculate

damages for forced labor, namely the minimum wage at the time of employment. *See* 18 U.S.C. § 1593(b)(3) (referencing 29 U.S.C. § 201); *see also Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *6 (E.D. Va. Sept. 4, 2012). However, so long as the salary provision is enforceable, victims are entitled to recover damages on contract theory alone. *See Gurung v. Malhotra*, 851 F. Supp. 2d 583, 590 (S.D.N.Y. 2012).

While the TVPA creates a federal cause of action for breach of contract, it does not supply independent rules of decision. *See generally* 18 U.S.C. § 1593. When federal law does not supply independent rules of decision, courts are to apply state rules of decision "regardless of the source from which the cause of action is deemed to have arisen for the purpose of establishing federal jurisdiction." *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995); *see also* 19 Fed. Prac. & Proc. Juris. § 4520 (2d ed.) ("it is the source of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law") (quoting *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 541-42 n.1 (2d Cir. 1956)). To determine which state's law governs, courts are to apply conflict-of-laws rules of the forum state. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

The District of Columbia applies the substantial interest test as set forth in the Restatement (Second) of Conflict of Laws to determine which jurisdiction's law applies in contracts cases. *See Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)); *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004). Under the substantial interest test, courts are to balance the competing interests of two jurisdictions and apply the law of the jurisdiction with the more significant interest. *Id.*

1.  The Court Will Apply Virginia Law to the Plaintiff's Breach of Contract Claims.

As a preliminary matter, neither party presents an argument over which jurisdiction's law supports and substantiates damages for the breach of contract. *See generally* Am. Compl.; *see* Answer; *see* Pl.'s Mot. for Default Judgment; *see* Pl.'s Supp'l Mot. The plaintiff briefly raises the issue by claiming overtime wages under federal law "because the Commonwealth of Virginia does not have its own overtime laws." Pl.'s Supp'l Mot. at 2. The defendant has not addressed the issue at all. *See generally* Answer.

In order to determine which jurisdiction's law to follow, courts sitting in the District of Columbia "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." *Jaffe*, 374 F. 3d at 402 (quoting *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987). To do this, courts are to consider (1) the place of contracting; (2) the place where the contract was negotiated; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188; *see also Ideal Elec. Sec. Co.*, 129 F.3d at 148.

In this case, while the parties assented to the contract in Bolivia, they contemplated that it would be performed in the defendant's Virginia home. *See* Am. Compl. ¶ 16; *see also* Contract § 1, 2. Indeed, the contract was performed in Virginia and both parties lived in Virginia for its duration. *See* Am. Compl. ¶ 21; *see also* Carazani Decl. ¶ 2, 4, 15. Therefore, the Court applies Virginia contract law to the instant matter.

2.  The Court Will Award $71,914.94 in Damages for Breach of Contract.

The plaintiff claims $128,247.95 in unpaid wages for breach of contract. *See* Pl.'s Supp'l
Mot. at 1-4. This larger figure is comprised of several smaller figures: accumulated wages for the
period of the contract, overtime wages, withheld holiday and vacation days, and accumulated
wages for the period the plaintiff worked after the Contract expired. *Id.* at 3.

The first issue among the smaller figures is the OES wage level at which the parties
contracted. The plaintiff supports the accumulated wages figure by pointing to the Contract,
which stipulates that the defendant was to pay the plaintiff the greater of $7.08 per hour or the
prevailing wage under DOS guidelines. *Id.* at 1 (citing Contract § 5). The plaintiff contends that
she is entitled to the prevailing wages of a Level Two Housekeeper because she meets the
definition of "qualified employees who have attained, either through education or experience, a
good understanding of the occupation," having worked for eleven years as the defendant's
housekeeper with sole responsibility for household chores. *Id.* at 2 (citing Pl.'s Supp'l Mot.,
[Dckt. #17, Ex. C], ("Prevailing Wage Guidance")). She distinguishes her responsibilities with
those of Level One Housekeepers, who are defined as "beginning level employees who have
only a basic understanding of the occupation." *Id.* (citing Prevailing Wage Guidance).

Under Virginia law, "the parties' contract becomes the law governing the case unless it is
repugnant to some rule of law or public policy." *Palmer & Palmer Co. v. Waterfront Marine
Constr., Inc.*, 276 Va. 285, 289 (2008); *Winn v. Aleda Constr. Co.*, 227 Va. 304, 307 (1984). It is
not contrary to public policy for a trafficking victim to enforce the terms of the contract under
the TVPA, which creates a cause of action for "lost income." *See* 18 U.S.C. § 1593(b)(3); *see
also Gurung*, 851 F. Supp. 2d at 590 (holding that the trafficking victim could recover lost
income under the terms of the contract).

Under the Contract, the plaintiff was to work forty hours per week from December 25, 2006 to December 25, 2008 for $7.08 per hour or "the greater of the minimum wage and the applicable prevailing wage under U.S. State Department guidelines." Contract §§ 1(b), 3, 5. Under DOS guidelines, the prevailing wage for domestic workers is measured using wage data collected under the Occupational Employment Statistics ("OES") Program. *See* DOS Cable, 05-State-00141634 (Aug. 8, 2005); 20 C.F.R. § 656.40 (2009). OES divides the prevailing wage for each profession into four levels "commensurate with experience, education, and level of supervision" and to be determined by "the particulars of the job offer." Prevailing Wage Guidance at 6.

Though the Contract clearly states that the plaintiff was to receive a starting salary of $7.08 per hour and that her wages would rise with the greater of the minimum wage and the prevailing wage, it is silent as to the wage level at which the plaintiff was hired. *See generally* Contract. Under Virginia law, "the guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Palmer & Palmer Co.*, 276 Va. at 289. When interpreting a contract, "no word or clause will be treated as meaningless if a reasonable meaning can be given to it." *Winn*, 227 Va. at 307.

In this case, the Contract was the job offer. *See* Carazani Decl. at ¶¶ 29, 30. The Contract stipulated that the plaintiff would be paid $7.08 per hour and identified that amount as the prevailing wage as of July 13, 2005. Contract § 5. On July 13, 2005, the prevailing wage for Level One housekeepers in the Washington, D.C. area was precisely $7.08. Maids and Housekeeping Cleaners Prevailing Wage, FOREIGN LABOR CERTIFICATION DATA CENTER ONLINE WAGE LIBRARY, http://www.flcdatacenter.com (last updated July 1, 2012). By contrast,

the prevailing wage for Levels Two, Three, and Four were $8.23, $9.38, and $10.53 respectively. *Id.* Though the Contract does not specifically state that the plaintiff was hired as a Level One housekeeper, that the job-offer wage was the same as the Level One prevailing wage and that the parties contracted under the OES guidelines indicates their intention for the plaintiff's wages to be adjusted according to the Level One prevailing wage. *See* Contract § 5. Therefore, the Court finds that the plaintiff's prevailing wage should be calculated according to Level One maids and housekeeping cleaners in the Washington D.C. metropolitan area.

The plaintiff worked full workweeks each week for the duration of the contractual period. *See generally* Pl.'s Supp'l Wage Calculation; Contract § 1(b). In exchange, the defendant paid the plaintiff a total of $8.50. *See* Am. Compl. ¶ 41. Therefore, the Court awards lost wages at the Level One prevailing wage for the 104 weeks the plaintiff worked under the Contract minus the $8.50 already paid, amounting to $32,982.30.

The second issue is the rate at which the plaintiff may collect unpaid overtime wages. The plaintiff claims that because the Contract stipulated that she would be paid overtime as required by state law and "because the Commonwealth of Virginia does not have its own overtime laws, Federal overtime law applies." *Id.* (citing 29 U.S.C. § 207(a)(1)). The defendant has not responded to the plaintiff's overtime claims other than to deny them. *See* Answer ¶ 70.

The Contract stipulated that "work in excess of 40 hours per week must be paid as required by state law." Contract § 6. However, the Commonwealth of Virginia has no compensation scheme for overtime work. *See Rogers v. City of Richmond*, 851 F. Supp. 2d 983, 989 (E.D. Va. 2012) (citation omitted) (observing that "Virginia law does not contain a clear, definite, enumerated standard of a maximum workweek"). Nevertheless, the FLSA establishes "a national floor" over which domestic workers must be compensated at least 1.5 times the "regular

rate at which he is employed" for working in excess of the maximum workweek. *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990); 29 U.S.C. § 207(a)(1), (l). Courts must construe the FLSA "liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959). Despite Virginia's lack of overtime compensation, the law of the Commonwealth does not impede the FLSA's purpose "to protect all covered workers from substandard wages and oppressive working hours." *See Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 304 (4th Cir. 2004).

The regular rate at which the plaintiff was employed was the prevailing wage for Level One maids and housekeepers in the Washington, D.C. region, ranging form $7.39 per hour in December 2006 to $8.41 per hour in December 2008. *See generally* Pl.'s Supp'l Wage Calculation. The plaintiff worked 3,312 hours in excess of a forty hour workweek over the course of the contractual period. *Id.* The defendant did not provide the plaintiff with any compensation for her overtime work. *See* Am. Compl. ¶ 40. Adjusting to the prevailing wage for each week during the contractual period and multiplying by the FLSA 1.5 premium compensation rate, the Court awards $38,615.40 in unpaid overtime to the plaintiff. *See* 29 U.S.C. § 207(a)(1).

The third issue is the amount the plaintiff may recover for withheld holiday and vacation days. The plaintiff claims that because she received neither the four paid holidays per year nor the fifteen paid vacation days per year as stipulated to in the Contract, she is entitled to $14.04 for each unpaid day. *See* Pl.'s Supp'l Mot. at 3. This figure is calculated by multiplying the three-year arithmetic average of the Level Two prevailing wage by 1.5. *Id.* The plaintiff claims that 1.5 is an appropriate factor because she never worked fewer than forty hours per week, and

the FLSA guarantees 1.5 times the regular wage for overtime work. *See id.* The defendant has

not responded to the plaintiff's argument for restitution of unpaid wages other than to deny it in

her Answer. *See* Answer ¶ 70.

The Contract stipulates that the plaintiff was to receive four paid holidays, five paid sick

days, and fifteen paid vacation days per year.[1] Contract § 4. However, it is silent on how or

whether the plaintiff would be compensated if she worked nevertheless during those days. *See id.*

Under the FLSA, employees who work on holidays are to be compensated "not less than one and

one-half times the rate established in good faith for like work performed in nonovertime hours on

other days." 29 U.S.C. § 207(e)(6). By contrast, the FLSA does not provide "premium

compensation" for sick days or vacation days. *See generally*, 29 U.S.C. § 207; *Scott v. City of

New York*, No. 02 Civ. 9530(SAS), 2008 WL 5099952, at *2 (S.D.N.Y. Dec. 2, 2008) (observing

that while the FLSA "implies a legislative assumption that all employees will have a five-day

workweek and will not work on holidays . . . there is no similar assumption that employees will

receive paid vacations").

The plaintiff worked over forty hours per week for the length of the Contract except for

four days she spent in the hospital in February 2008. *See* Am. Compl. ¶ 21; *see also* Carazani

Decl. ¶¶ 40, 67. The Contract stipulated that the plaintiff would receive four paid holidays.

Contract § 4. Nevertheless, the plaintiff received no time off for holidays. *See* Carazani Decl. ¶

40. Therefore, the Court awards the plaintiff four days compensation at 1.5 times the average

prevailing wage for each year of the Contract, amounting to $95.20. *See* 29 U.S.C. § 207(e)(6);

Contract at § 4. Similarly, the Contract stipulated that the plaintiff would receive fifteen paid

vacation days. Contract § 4. Nevertheless, the plaintiff received no time off for vacation. *See*

---

[1] Though the English version of the Contract is silent on whether the plaintiff would receive paid
holidays, the Spanish version stipulates that the plaintiff would receive paid holidays. *See* Spanish
Contract § 4.

Carazani Decl. ¶ 40. As the FLSA does not provide premium compensation for vacation days, the Court awards the plaintiff fourteen days compensation at a rate equal to the average prevailing wage for each year of the Contract, amounting to $222.04. *See generally* 29 U.S.C. § 207; Contract § 4.

The fourth issue is the amount the plaintiff may recover in medical expenses. The plaintiff claims that she is owed $3,731.26 for medical expenses, an amount calculated by subtracting her total medical expenses by donations and the amount forgiven by healthcare providers. *See* Pl.'s Supp'l Mot. at 4. She supports this figure by arguing that the defendant breached the Contract's provision requiring the employer to provide medical insurance for the employee. *See id.* (citing Contract § 9). The plaintiff claims that the defendant's breach of contract prevented the medical expenses she incurred during the period of the contract from being covered by insurance. *See id.* (citing Medical Expenses). The defendant does not respond to the plaintiff's medical expenses breach of contract claim other than to deny that she failed to provide medical insurance. *See* Answer ¶ 69.

The Contract stipulates that "[t]he Employer is required to provide medical insurance for the Employee at no cost to the Employee." Contract § 9. Under the Restatement (Second) of Contracts, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." RESTATEMENT (SECOND) OF CONTRACTS § 90. However, the Supreme Court of Virginia summarily rejected section 90 and the doctrine of promissory estoppel in a trio of cases. *See W.J. Schafer Assoc., Inc. v. Cordant Inc.* 254 Va. 514, 516 (1997); *Va. Sch. of the Arts, Inc. v. Eichelbaum*, 254 Va. 373, 377 (1997); *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va.

379, 385 (1997). Moreover, an individual may not recover for damages that result from a

promise to provide insurance. *See Nat'l Bank of Fredericksburg v. Va. Farm Bureau Fire and

Cas. Ins. Co.*, 269 Va. 148, 152 n.1 (2005). Virginia has refused to make an exception for

employment contracts; employees are also barred from recovery under a theory of promissory

estoppel, though they may recover outside the contract under a theory of quantum meruit. *See

Mongold v. Woods*, 278 Va. 196, 202-03 (2009).

　　　The defendant may have reasonably expected to induce medical expenses when she

promised to provide the plaintiff with medical insurance. However, under Virginia law, the

plaintiff may not recover medical expenses she incurred while relying on the defendant's

promise to provide insurance. *See Nat'l Bank of Fredericksburg*, 269 Va. at 152 n.1. Such a

theory is contrary to Virginia's rejection of promissory estoppel. *See W.J. Shafer Assoc., Inc.*,

254 Va. at 516 n.1; *Mongold*, 278 Va. at 202-03. Therefore, the Court awards no damages for the

plaintiff's medical expenses under a theory of promissory estoppel.[2]

　　　For the foregoing reasons, the Court awards $71,914.94 in damages for breach of

contract.

### C.  Legal Standard for Quantum Meruit

　　　Under the TVPA, the order of restitution "shall direct the defendant to pay the victim . . .

the full amount of the victim's losses, which "include the greater of the gross income or value to

the defendant of the victim's services or labor or the value of the victim's labor as guaranteed

under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. §

1593(b)(1), (3). Where federal law does not supply independent rules of decision, courts are to

apply state rules of decision "regardless of the source from which the cause of action is deemed

---

[2] Instead, the Court awards damages for the plaintiff's medical expenses under a theory of quantum meruit. *See infra* pp. 25-26.

to have arisen for the purpose of establishing federal jurisdiction." *A.I. Trade Fin., Inc.*, 62 F.3d at 1463.

Under Virginia law, a plaintiff may seek restitution under a theory of quantum meruit, which is "based upon an implied contract to pay the reasonable value of services rendered." *Mongold*, 278 Va. at 203; *see also Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 152 (2009); *Marine Dev. Corp. v. Rodak*, 225 Va. 137, 140 (1983) (holding that it is "a general rule of law that he who gains the labor . . . of another must make reasonable compensation for the same.") (citing *Hendrickson v. Meredith*, 161 Va. 193, 198 (1933)). Quantum meruit recovery is not based on contract law, but rather a "contract implied in law," established by principles of equity "to avoid unjust enrichment." *See Po River Water & Sewer Co. v. Indian Acres Club of Thornburg, Inc.*, 255 Va. 108, 114 (1998). An individual's liability "is based on an implication of law that arises from the facts and circumstances presented, independent of agreement or presumed intention." *Id.* That the agreed-upon price or form of compensation is "too indefinite" does not impede a quantum meruit recovery. *Marine Dev. Corp.*, 225 Va. at 141 (quoting *Brakensiek v. Shaffer*, 203 Kan. 817, 822 (1969)).

### D.  The Court Will Award $37,926.34 in Quantum Meruit.

The plaintiff claims damages based entirely on the Contract itself, including for services provided after the contractual period ended on December 25, 2008. *See* Pl.'s Supp'l Mot. at 3; *see also* Contract § 1(b). She also alleges unjust enrichment for "rendered services as a live-in domestic servant . . . with the expectation that she would be fairly compensated for such services." Am. Compl. ¶¶ 74-79. The defendant has not responded to the plaintiff's unjust enrichment argument, other than to deny it. *See* Answer ¶¶ 74-79.

The TVPA creates a cause of action of restitution for the "greater of the gross income or value to the defendant of the victim's services." 18 U.S.C. 1593(b)(3). Because the TVPA creates a cause of action in quantum meruit but no independent rules of decision, *A.I. Trade Fin., Inc.*, 62 F.3d at 1463, and for the aforementioned choice-of-law analysis, *see infra* pp. 15-16, the Court applies Virginia law to the instant case. Virginia law "requires one who accepts and receives the services of another to make reasonable compensation for those services." *Po River Water and Sewer Co.*, 255 Va. at 114; *see also Va. Fin. Assocs., Inc. v. ITT Hartford Grp., Inc.*, 266 Va. 177, 182 (2003); *Mongold*, 278 Va. at 205. In order to award a quantum meruit recovery, "the court must conclude that there is no enforceable express contract between the parties covering the same subject matter." *Mongold*, 278 Va. at 204. In cases where there is an employment contract and where the employee works longer than the terms of the contract, the employee may recover at the contract rate so long as there is "no evidence to suggest that the same rate was unreasonably high for his additional, uncompensated work." *See id.* at 205. Wage rates that are no higher than the rate upon which the parties agreed are "reasonable compensation," as are rates that fluctuate with the prevailing wage. *See id.*

In this case, the Contract expired on December 25, 2008 along with the plaintiff's visa. *See* Contract § 1(b); Am. Compl. ¶ 44. Despite the expiration of the Contract, the defendant continued to accept the defendant's services as a housekeeper and nanny until she escaped on December 11, 2009. *See* Carazani Decl. ¶ 15, 92; Am. Compl. ¶ 5; Pl.'s Supp'l Mot. at 3. While out of contract, the plaintiff worked 66 hours per week for 49 weeks. Pl.'s Supp'l Wage Calculation. Because the plaintiff continued to provide the same services to the defendant after the Contract expired, the Court awards damages in quantum meruit at a rate equal to the breach

of contract damages: $16,730.92 for regular hours, $17,296.16 for overtime, $50.40 for unpaid holidays, and $117.60 for unpaid vacation days, amounting to a total of $34,195.08.

In addition to wages, the plaintiff provided services with the expectation that she would be compensated with medical insurance for her dependents and her. *See* Contract § 9; Carazani Decl. ¶¶ 10, 33, 52. Following this expectation, the plaintiff incurred $35,849.33 in medical expenses ranging from hospital visits to a pair of eyeglasses for her son. *See* Am. Compl. ¶ 75; *see generally* Medical Expenses. The plaintiff either paid or continues to owe $3,731.26 of these expenses. *Id.* While she may not recover for such expenses under a theory of promissory estoppel, she may recover under a theory of quantum meruit so long as recovery does not contravene an express contract. *See Mongold*, 278 Va. at 204-05. In this case, there was no express contract with respect to compensation for the plaintiff's medical expenses; the Contract stipulates that the defendant "is required to provide medical insurance for the Employee at no cost to the Employee," though it specifies neither the type of medical insurance nor how the plaintiff should be compensated in the event the defendant provides no insurance. *See* Contract § 9. Despite the lack of an express contract, the defendant promised medical insurance, *id.*, knew the plaintiff felt an obligation to pay her medical bills, Carazani Decl. ¶ 58, and told the plaintiff that she would "look into" providing insurance as the plaintiff incurred medical expenses. *Id.* ¶ 70. The defendant benefited from this representation by receiving the defendant's services around the clock for nearly three years. Am. Comp. ¶¶ 2, 21, 24-25; Carazani Decl. ¶¶ 6, 38-40, 45, 53; Pl.'s Supp'l Mot. at 3; Pl.'s Supp'l Wage Calculation. Therefore, the "reasonable value of the services" the plaintiff rendered on the defendant, *see Va. Fin. Assocs., Inc.*, 266 Va. at 183, includes her medical expenses in addition to the value of her wages under the Contract.

Accordingly, the Court awards the $3,731.26 the plaintiff owes for incurred medical expenses. *See* Pl.'s Supp'l Mot. at 4.

### E.  Legal Standard for Liquidated Damages

Under the FLSA, any employer who violates §§ 206 or 207 may be liable to the affected employee "in the amount of their unpaid minimum wages, or unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).[3] The purpose of the liquidated damages provision "is not penal in nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). The FLSA liquidated damages provision applies to restitution awards under the TVPA. *See United States v. Sabhnani*, 599 F.3d 215, 259 (2d Cir. 2010) (finding that "statutory provisions other than §§ 206 and 207 are relevant in determining what FLSA's 'minimum wage and overtime guarantees' are"); *Doe*, 2012 WL 3834867, at *6. Under the FLSA, liquidated damages must be awarded unless the defendant "shows to the satisfaction of the court that it acted in good faith and had reasonable grounds for believing that its acts did not violate the FLSA." *D'Camera v. Dist. of Columbia*, 722 F. Supp. 799, 800 (D.C. Cir. 1989).

### F.  The Court Will Award $102,606.21 in Liquidated Damages.

The plaintiff claims $102,606.21 in liquidated damages under the FLSA. Pl.'s Supp'l Mot. at 4. The plaintiff believes her employment relationship with the defendant brings her within the ambit of the FLSA. *See* Am. Compl. ¶ 61. Additionally, the plaintiff contends that the defendant violated § 206 by failing to pay any wages and that she violated § 207 by failing to

---

[3] Under § 206, an employer shall pay employees in domestic service a minimum of $7.25 per hour. 29 U.S.C. §§ 206(a)(1)(C), (f). Under § 207, an employer shall not employ an individual in domestic service for a workweek longer than forty hours without paying overtime compensation. 29 U.S.C. §§ 207(a)(1), (l).

pay overtime compensation. *See* Pl.'s Supp'l Mot. at 5 (citing Am. Compl. §§ 62-65; Carazani Decl. ¶¶ 44-46, 53-54, 64, 89-92). Moreover, the plaintiff argues that under the FLSA, the overtime compensation rate is part of the liquidated damages calculation, along with minimum wages for regular hours. *See id.* at 5 n.5. The plaintiff argues that because the defendant "willfully, intentionally, and without good faith" violated §§ 206 and 207, the defendant owes her $102,606.21 in liquidated damages.

The FLSA states that an employer who violates §§ 206 or 207 of the Act may be liable for liquidated damages equal to unpaid minimum wages or unpaid overtime compensation. 29 U.S.C. § 216(b). An employer violates § 206 by failing to pay an employee in domestic service $7.25 per hour. 29 U.S.C. §§ 206(a)(1)(C), (f). An employer violates § 207 by failing to pay an employee in domestic service overtime compensation for work in excess of forty hours per week. 29 U.S.C. §§ 207(a)(1), (l). FLSA liquidated damages must be awarded unless the employer demonstrates that he acted in good faith and had "reasonable grounds" for believing that its acts did not violate the FLSA. *D'Camera*, 722 F. Supp. at 800.

In this case, the Court has deemed the defendant to have admitted every well-pleaded allegation in the complaint by entering default judgment. The defendant has effectively admitted that she "willingly failed to pay Ms. Carazani statutory minimum wages—or any wages—in violation of 29 U.S.C. § 206(a)," and thereby has failed to demonstrate any good faith. *See* Am. Compl. ¶ 62. The defendant also violated § 207 by failing to pay the plaintiff overtime compensation despite the 4,586 hours the plaintiff worked in overtime. *See* 29 U.S.C. 207(a)(1); Am. Compl. §§ 62-65; Carazani Decl. ¶¶ 44-46, 53-54, 64, 89-92. Therefore, the Court awards liquidated damages equal to unpaid minimum wages and unpaid overtime compensation for the period that the plaintiff worked for the defendant, amounting to $102,606.21.

### G. Legal Standard for Emotional Distress Damages

The TVPA recognizes emotional distress damages as a "form of compensatory damages." *See Francisco v. Susano*, No. 12-1376, 2013 WL 2302691, at *6 (10th Cir. May 28, 2013) (unpublished); *see also Doe*, 2012 WL 3834867, at *2; *Mazengo v. Mzengi*, No. 07-756 (RMC)(AK), 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007); *Gurung*, 851 F. Supp. 2d at 594. Under the TVPA, "the order of restitution shall direct the defendant to pay the victim . . . the full amount of the victim's losses," which include "medical services relating to physical, psychiatric, or psychological care; . . . physical and occupational therapy or rehabilitation; . . . and any other losses suffered by the victim as a proximate result of the offense." 18 U.S.C. § 1593(b)(1); 18 U.S.C. § 2259(b)(3). To determine emotional distress damages, courts are to examine "the duration and intensity of the emotional distress." *Mazengo*, 2007 WL 8026882, at *7. Courts also look to other awards in similar cases "to ensure that the award is within a reasonable range." *Doe*, 2012 WL 3834867, at *2; *see also Shukla v. Sharma*, No. 07-CV-2972 (CBA)(CLP), 2012 WL 481796, at *14 (E.D.N.Y. Feb, 14, 2012); *Curry v. District of Columbia*, 195 F.3d 654, 663 (D.C. Cir. 1999) (holding that an award for emotional distress is "grossly excessive" if it is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may operate."

### H. The Court Will Award $433,200 in Emotional Distress Damages.

The plaintiff claims $433,200 in emotional distress damages under the TVPA. Pl.'s Supp'l Mot. at 5. The plaintiff alleges that by trafficking her, forcing her into involuntary labor, isolating her from other human beings, restricting her communication, and psychologically abusing her, the defendant "traumatized, depressed, and even drove Plaintiff to consider suicide." *Id.* at 7. The plaintiff argues that this "extreme emotional distress" was the "proximate result" of

the defendant actions, and that she is therefore entitled to emotional distress damages under the TVPA. *See* Am. Compl. ¶¶ 93-94. To calculate damages, the plaintiff claims $400 for each day of forced labor, which "falls below the actually awarded range of emotional damages for trafficking victims held to forced labor." Pl.'s Supp. Mot. at 7. The defendant has not responded to the plaintiff's emotional distress argument other than to deny it. *See* Answer ¶¶ 91-95.

Under the TVPA, a plaintiff may recover emotional distress damages for losses suffered that are the "proximate result of the offense." *See* 18 U.S.C. § 2259(b)(3); *Doe*, 2012 WL 3834867, at *2. To measure the extent of damages, courts consider "all relevant circumstances . . . , including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo*, 2007 WL 8026882, at *7 (quoting RESTATEMENT (SECOND) OF TORTS § 905 (1979)). Among these circumstances, courts consider false promises to provide a salary, health insurance, vacation time and a safe place to live and work. *See Doe*, 2012 WL 3834867, at *4. Additionally, courts determine if the award is "within a reasonable range" by looking to similar awards for trafficking victims. *See Mazengo*, 2007 WL 8026882, at *7. The *Doe* court observed that in recent cases, "[c]ourts have ordered or affirmed emotional distress damages relating to forced domestic labor of trafficking victims ranging from $415 to $800 for each day of forced labor." *Doe*, 2012 WL 3834867, at *9; *but see Mazengo*, 2007 WL 8026882, at *7 (awarding approximately $171 in emotional distress damages for each day of forced labor).

As a result of the Court entering default judgment against the defendant, the defendant has effectively admitted the plaintiff's TVPA, negligent infliction of emotional distress, and intentional infliction of emotional distress claims. *See* Am. Compl. ¶¶ 45-51, 91-102.

First, the Court orders restitution to pay for the victim's "medical services relating to physical, psychiatric, or psychological care" and "physical and occupational therapy or rehabilitation" that were the proximate cause of the defendant's actions. *See* 18 U.S.C. § 2259(b)(3). On October 22, 2008, the plaintiff visited the hospital after suffering an anxiety attack, incurring $2,249.00. *See* Carazani Decl. ¶ 75; Medical Expenses.

In addition to concrete medical expenses, the plaintiff has suffered several "other losses" that were the "proximate result of the offense." *See* 18 U.S.C. § 2259(b)(3). The plaintiff spoke no English upon coming to the United States and relied on the defendant for her employment, meals and lodging, and medical insurance. *See* Am. Compl. § 27; Contract §§ 2, 8, 9. The defendant forbade the plaintiff to talk to neighbors, led her to believe the telephone was tapped, and failed to renew her visa in 2008 (thereby rendering the plaintiff an undocumented immigrant). *See* Am. Compl. § 44; Carazani Decl. ¶¶ 7,8. When the plaintiff asked the defendant about her unpaid wages, the defendant would yell at her, call her a "failure," and "throw things around the house." Carazani Decl. ¶ 49. As a result of this experience, Carazani exhibited symptoms of dissociation, hyperarousal, mood dysregulation, and changes in neurovegetative indicators, such as sleep, appetite, and concentration. Pl.'s Supp'l Mot., [Dckt. #17, Ex. H], ("Sandoval-Moshenberg Aff."). The plaintiff at one point considered suicide. Carazani Decl. ¶ 105. Based on these symptoms, a mental health counselor diagnosed the plaintiff with post-traumatic stress disorder and major depressive disorder. Sandoval-Moshenberg Aff. ¶ 4.

To determine the size of the award, the Court looks to similar awards for trafficking victims. Several cases bear similarity to the instant case, though many involve circumstances even more egregious than those at bar. In *Doe*, the court awarded $500 for each day of forced labor, though the defendant was subjected to extensive sexual abuse in addition to forced labor.

Likewise, in *Gurung*, the court awarded $410 for each day of forced labor, though the plaintiff

was forced to give the defendant daily massages, which made her "extremely uncomfortable."

*Gurung*, 851 F. Supp. 2d at 588. In *Mazengo*, where the plaintiff was subjected to forced labor

but not sexual abuse, the court awarded approximately $171 in compensatory emotional distress

damages for each day of forced labor. *Mazengo*, 2007 WL 8026882, at *7. Based on the range of

awards, the Court finds $400 for each day of forced labor reasonable, and therefore awards

$433,200 in compensatory damages for emotional distress.

### I.  Legal Standard for Punitive Damages

In tort cases, punitive damages are "awarded against a person to punish him for his

outrageous conduct and to deter him and others like him from similar conduct in the future."

RESTATEMENT (SECOND) OF TORTS § 908 (1979); *see also Exxon Shipping Co. v. Baker*, 554

U.S. 471, 505 (2008). Courts may award punitive damages irrespective of the defendant's prior

criminal conviction for the same conduct. Restatement (Second) of Torts § 908 cmt. a; *State

Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 428 (2003) (holding that punitive damages

"are not a substitute for the criminal process"). In fact, punitive damages are appropriate for

"conduct involving some element of outrage similar to that usually found in crime."

RESTATEMENT (SECOND) OF TORTS § 908 cmt. b; *see also Exxon Shipping Co.*, 554 U.S. at 504-

05.

Under the TVPA, victims may bring a civil action against the perpetrator and "may

recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Where federal statutes

sounding in tort are silent on the availability of punitive damage, courts look to common law

principles to determine the scope of remedies. *See Smith v. Wade*, 461 U.S. 30, 34 (1983); *Carey

v. Piphus*, 435 U.S. 247, 257-58 (1978). The U.S. Supreme Court has long recognized the

availability of punitive damages for actions based in tort under common law. *See Barry v. Edmunds*, 116 U.S. 550, 562 (1886); *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009). In enacting the TVPA and creating a cause of action against human trafficking, conduct that "obviously meets the common law standards for award of punitive damages because it is both intentional and outrageous," Congress created an action that sounded in tort. *Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011). Punitive damages are therefore available under the TVPA. *See Ditullio*, 662 F.3d at 1096; *Francisco*, 2013 WL 2302691, at *5 (agreeing with "the only other circuit to address the matter"); *Doe*, 2012 WL 3834867, at *4; *Yousuf v. Samantar*, No. 1:04cv1360 (LMB/JFA), 2012 WL 3730617, at *14 (E.D. Va. Aug. 28, 2012); *Canal v. Dann*, No. 09-03366 CW, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010).

## J.  The Court Will Award $543,041.28 in Punitive Damages.

The plaintiff claims $565,179.21 in punitive damages, an amount equal to that the plaintiff claims in compensatory damages. Pl.'s Supp'l Mot. at 6-7 (citing *Shukla*, 2012 WL 481796, at *16). The plaintiff argues that punitive damages should be based on "the degree of reprehensibility of the defendant's conduct," further noting that she was "victim of a severe form of trafficking" and suffered "physical and mental injury, economic loss, and emotional distress" as a result of her experience." *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)); *see also* 8 C.F.R. § 214.11 (2009); Pl.'s Supp'l Mot., [Dckt. #17, Ex. G], ("T-Visa"); Am. Compl. ¶ 56. The defendant has not responded to the plaintiff's punitive damages claim other than to deny it. *See* Answer ¶¶ 80-102.

Punitive damages are available under the TVPA. *Ditullio*, 662 F.3d at 1096; *Francisco*, 2013 WL 2302691, at *5. In determining punitive damages, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's

conduct." *Gore*, 517 U.S. at 575. Courts must consider whether "the harm was physical rather than economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit or mere accident." *Campbell*, 538 U.S. at 409 (citing *Gore*, 517 U.S. at 576-77). Courts must also consider the amount awarded in compensatory damages. *Hutchinson v. Stuckey*, 952 F.2d 1418, 1421 (D.C. Cir. 1992); *Shukla*, 2012 WL 481796, at *16 (awarding a 1:1 ratio of compensatory to punitive damages for a TVPA defendant of "modest means"). In keeping with its deterrence purpose, an award of punitive damages must be limited by the erring party's ability to pay. *Hutchinson*, 952 F.2d at 1423 n.4. However, the erring party has the burden to demonstrate that her financial circumstances warrant such a limitation. *Id.*

In this case, the crime of forced labor and trafficking is particularly depraved. The harm was physical and involved a reckless disregard for the health of the plaintiff. The defendant accepted the plaintiff's services around the clock, seven days per week for nearly three years and paid her a total of $8.50. *See* Am. Comp. ¶¶ 2, 21, 24-25; Carazani Decl. ¶¶ 6, 38-40, 45, 53; Pl.'s Supp'l Mot. at 3; Pl.'s Supp'l Wage Calculation. The defendant repeatedly threatened the plaintiff with deportation and surveillance, withheld legal documents, and forbade her to speak with neighbors. *See* Am. Compl. ¶¶ 27-32; Carazani Decl. ¶ 7-9, 36, 77-81. As a result of this conduct, the plaintiff developed symptoms of dissociation, hyperarousal, mood dysregulation, changes in neurovegetative indicators, anxiety attack, post-traumatic stress disorder, and major depressive disorder. *See* Carazani Decl. ¶¶ 75, 105; Sandoval-Moshenberg Aff. ¶ 4. Following previous courts, which have found a 1:1 ratio of compensatory to punitive damages a sufficient deterrent to offenders of the TVPA, the Court awards punitive damages equal to its

compensatory damages award: $543,041.28.[4] *See Shukla*, 2012 WL 481796, at *16; *Canal*, 2010 WL 3491136, at *4.

## IV. CONCLUSION

Based on the reasoning provided herein, the Court enters default judgment against Defendant Emma Zegarra and awards $1,188,688.77 in Plaintiff Virginia Carazani's favor.[5]

RUDOLPH CONTRERAS
United States District Judge

---

[4] The plaintiff claims in the alternative economic, emotional, and punitive damages for fraud and fraudulent inducement and negligent or intentional infliction of emotional distress "to the extent that the Court has not already granted it as damages under breach of contract or the TVPA" and "if the Court has not already awarded the full $350,000 in punitive damages permitted by Virginia law for state-law torts." Pl.'s Supp. Mot. at 8-9. Under Virginia law, an award of punitive damages is capped at $350,000. Va. Code Ann. § 8.01-38.1. Therefore, having already awarded $95,070.80 as economic damages for breach of contract, $433,200 as emotional distress damages under the TVPA, and $560,974.02 as punitive damages under the TVPA, the Court does not award additional damages for state-law claims of fraud and fraudulent inducement or negligent or intentional infliction of emotional distress.

[5] The plaintiff has requested to reserve the right to submit a claim for attorneys' fees given the uncertainty as to whether she will attempt to resume litigation later. Pl.'s Supp. Mot. at 4 n.4. Accordingly, the Court reserves judgment on attorneys' fees until such submission.